UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| NIKKI R. FLATEQUAL,<br><br>                              Plaintiff,<br><br>    vs.<br><br>ANDREW M. SAUL, Commissioner of<br>the Social Security Administration,<br><br>                              Defendant. | 4:19-CV-04045-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

## INTRODUCTION

Plaintiff, Nikki R. Flatequal, seeks judicial review of the Commissioner's

final decision denying her application for social security disability and

supplemental security income disability benefits under Title II and Title XVI of

the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  Ms. Flatequal filed her application for both types of benefits.  AR211, 213, 255, 282, 285, 297.  Her coverage status for SSD benefits expires on June 30, 2021.  AR17.  In other words, in order to be entitled to Title II benefits, Ms. Flatequal must prove disability on or before that date.

Ms. Flatequal has filed a complaint and motion to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings. <u>See</u> Docket No. 1, 13. The Commissioner has filed his own motion seeking affirmance of the decision at the agency level. <u>See</u> Docket No. 17.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.    Statement of the Case

This action arises from plaintiff Nikki R. Flatequal's ("Ms. Flatequal") application for SSDI and SSI filed on February 17, 2016, alleging disability since December 31, 2015, due to a brain tumor, an open reduction internal fixation of the left clavicle, left-sided craniotomy for tumor resection, depression, anxiety, and hip and knee pain. AR211, 213, 255, 282, 285, 297. Ms. Flatequal's claim was denied initially and upon reconsideration. AR168, 177, 184. Ms. Flatequal then requested an administrative hearing. AR1191.

Ms. Flatequal's administrative law judge ("ALJ") hearing was held on March 16, 2018, by Lyle Olson. AR68. Ms. Flatequal was represented by other

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket 12). The court has made only minor grammatical and stylistic changes. Citations to the appeal record will be cited by "AR" followed by the page or pages.

counsel at the hearing, and an unfavorable decision was issued on May 4, 2018.  AR12, 68.

At Step One of the evaluation, the ALJ found that Ms. Flatequal was insured for benefits through June 30, 2021, and that she had not engaged in substantial gainful activity ("SGA") since December 31, 2015, the alleged onset of disability date.  AR17.

At Step Two, the ALJ found that Ms. Flatequal had severe impairments of a history of left mid-shaft clavicle fracture with non-union (status post open reduction and internal fixation); status post left posterior/frontal craniotomy for Grade I meningioma; degenerative changes, lumbar spine, with degenerative disc disease most severe at L5-S1 and moderate neural foraminal stenosis on the left at L5-S1 with mild compression of the intraforaminal left L5 nerve root; status post anterior discectomy and C5-6 fusion with degenerative retrolisthesis and moderate central spinal stenosis at C6-7, with left side radiculopathy; cervicalgia, headaches; left piriformis syndrome; fibromyalgia; neurocognitive disorder; major depressive disorder, recurrent, moderate; and an unspecified anxiety disorder.  AR18.

The ALJ found that Ms. Flatequal also had additional medically determinable impairments of osteopenia, hyperlipidemia, and diverticulitis, but found they were not severe.  AR18.  The ALJ found that Ms. Flatequal's borderline personality disorder was not a medically determinable impairment.  AR18.

At Step 3, the ALJ found that Ms. Flatequal did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1 (hereinafter referred to as the "Listings"). AR18-21. The ALJ considered the mental impairments, and found that Ms. Flatequal had moderate limitations in understanding, remembering, or applying information, moderate limitations in interacting with others, moderate limitations with concentration, persistence or maintaining pace, and moderate limitations in adapting or managing herself, so did not meet a Listing. AR19-20.

The ALJ determined that Ms. Flatequal had the residual functional capacity ("RFC") to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit with normal breaks for a total of about 6 hours in an 8-hour workday, stand and/or walk with normal breaks for a total of about 6 hours in an 8-hour workday, occasionally engage in push/pull actions (i.e., hand controls) with the left dominant hand (with no resistance greater than 20 pounds), occasionally climb ramps/stairs, balance, stoop, kneel and crouch, and never climb ladders/scaffolds, crawl, work at unprotected heights or work with dangerous moving mechanical parts. Mentally, the claimant retains the ability to understand, remember and carry out short, simple instructions, interact appropriately with supervisors and co-workers on an occasional basis and with the public on a brief and superficial basis only, respond appropriately to changes in a routine work setting, and make judgments on simple work-related decisions.

AR21.

The ALJ's subjective symptom finding was that Ms. Flatequal's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however her statements concerning the intensity, persistence and limiting effects of her symptoms were not "entirely consistent with the medical

4

evidence and other evidence in the record for the reasons explained in this decision." AR23.

The ALJ considered the opinions of the State agency initial level psychological consultant and gave them "no weight." AR25. The ALJ considered the opinions of the State agency reconsideration level psychological consultant and gave them "great weight." AR25. The ALJ considered the opinion of treating psychiatrist, Michael Bergan, MD, and gave his opinion "great weight." AR26.

The ALJ considered the opinions of the State agency medical consultants from both the initial level and reconsideration level, and gave them "no weight" because the opinions were inconsistent with the medical evidence. AR25.

The ALJ considered the opinion of treating orthopedic physician Matthew Wingate, MD, and gave his opinion "partial weight" to the extent the opinion supported a capacity to perform light exertion work, but rejected the portions of the opinion which would restrict Ms. Flatequal to sedentary work. AR26. Dr. Wingate restricted Ms. Flatequal to lifting 10 pounds occasionally, standing or walking to no more than two hours of an 8-hour workday with alternating sitting and standing every 30 minutes due to pain, but the ALJ did not specify which of Dr Wingate's limitations supported light exertion work. AR26.

The ALJ considered the opinion of treating physician Scott Dierks, MD, who the ALJ indicated opined that Ms. Flatequal was limited to less than a full range of sedentary work, and gave his opinions only "partial weight" because the ALJ asserted Dr. Dierks' treatment notes indicated full range of motion of

extremities, appropriate muscle strength, full sensation and normal gait. AR26-27.

The ALJ also considered the mental health opinions of treating physician Scott Dierks, MD, who the ALJ indicated opined that Ms. Flatequal had marked limitations in her ability to complete a full work day without extra breaks, and noted that the opinion was consistent with Ms. Flatequal's alleged symptoms, but inconsistent with Dr. Bergan's opinions. The ALJ did not state what, if any, weight he gave Dr. Dierks' opinions regarding Ms. Flatequal's mental limitations. AR27.

Based on the RFC, the ALJ found that Ms. Flatequal was not capable of performing her past relevant work. AR27.

The ALJ stated in his decision:

> At the hearing, the undersigned asked the vocational expert to assume a hypothetical for an individual with the residual functional capacity as previously determined by the undersigned in this decision. When asked whether such a hypothetical individual could perform any of the claimant's past relevant work, the vocational expert testified such an individual could perform the claimant's past work at the semiskilled and skilled levels. However, the undersigned finds that the claimant's mental residual functional capacity is more consistent with an individual limited to unskilled work that precludes the mental demands of the claimant's past relevant work.

AR27. However, the asserted question by the ALJ and asserted answer by the vocational expert does not appear any where in the hearing transcript. AR66-114. The vocational expert did affirm in response to the ALJ's question that Ms. Flatequal's past work would be excluded. AR108.

At Step 5, the ALJ found Ms. Flatequal capable of adjusting to other work that existed in significant numbers, such as copy machine operator, DOT# 207.685-014; mail clerk, DOT# 209.687-026; and clerical checker, DOT# 222.687-010, relying on testimony from the vocational expert regarding the number of jobs available for each occupation nationally and denied the claim. AR28-29.

Ms. Flatequal timely requested review by the Appeals Council. AR209. The Appeals Council denied Ms. Flatequal's request for review, making the ALJ's decision the final decision of the Commissioner. AR1-5.

**B.  Plaintiff's Age, Education and Work Experience.**

Ms. Flatequal was born in 1966 making her 49 years old at the onset of disability and turning age 50, a person closely approaching advanced age, in October, 2016. AR27, 211. She completed four or more years of college in 1989. AR256. The ALJ found that Ms. Flatequal had multiple past relevant jobs at both the skilled and semi-skilled level. AR27.

**C.  Relevant Medical Evidence.**

**1.  Avera McGreevy Clinic:**

Ms. Flatequal saw Dr. Dierks, her primary care physician, on May 4, 2015, and the psychological exam indicated no evidence of anxiety or depression, but her Celexa dosage was increased for her depression at her request. AR689-90. When seen again on May 7, 2015, the treatment note stated she has recently been seen for depression. AR681. She had been

having chronic abdominal pain, which had been evaluated by a gastroenterologist with no resolution. AR682-83.

Chart notes for January 4, 2016, indicate that Ms. Flatequal called and informed the clinic she had fallen on the ice on December 31, 2015, fracturing her skull and collar bone, and a CT scan obtained as a result revealed a brain tumor. AR420. The CT scan obtained on December 31, 2015, following her fall revealed prior post-operative changes from C5-C6 that is solidly fused and diffuse degenerative changes. AR489. Other images of the left shoulder revealed a displaced overriding mid left clavicle fracture. AR489.

Ms. Flatequal saw Dr. Dierks on March 5, 2016, following surgery to repair her collar bone due to some swelling at the incision site, and she was also scheduled for brain surgery for her tumor. AR649.

Ms. Flatequal saw Dr. Dierks on June 15, 2016, for a physical and right hip and right knee pain, and she continued to have pain in her left clavicle. AR872, 874. X-rays were planned for her hip and knee and the scar on her shoulder was to be excised. AR878.

Ms. Flatequal saw Dr. Dierks on August 8, 2016, to follow up on her elevated blood pressure and worsening pain in both hips. AR844. Dr. Dierks felt that Ms. Flatequal's prior hip x-ray had shown a little arthritis and she had started on naproxen initially as needed and now daily. AR849. Examination revealed pain to palpation and swelling on the right over the iliac crest, and she was referred to orthopedics for her hip pain. AR849.

Ms. Flatequal saw Dr. Dierks on October 31, 2016, to follow up on her ongoing hip pain. AR841. She had been to orthopedics and an MRI did not reveal the cause of the pain, she continued taking naproxen, and had tried chiropractic treatment without relief, and was having fatigue. AR841. Examination revealed a little pain and swelling over the SI joint, the right lower back, and the paraspinal muscle area. AR842. Naproxen was stopped and she was referred for physical therapy. AR842.

Ms. Flatequal saw Dr. Dierks on June 7, 2017, for neck, hip, right ankle pain, and a painful lump over her left axilla area. AR966. Her back pain was bilateral in the lower back and hip area and was relatively constant but worse with bending. AR966. Examination revealed tenderness over the C7 to T1 area, trapezius muscle tenderness, a very tender subcutaneous nodule in her left axilla, tenderness in the lower back bilaterally over her SI joints, and a focal small slightly boggy swelling over the right lateral malleolus with tenderness and bruising. AR971-72. An HLA-B27 blood test was ordered and x-rays of the lower back and cervical area were ordered. AR972. Lumbar spine x-rays revealed mild spondylosis. AR1188. Cervical spine x-rays revealed anterior interbody fusion at the C5-6 level, degenerative disc changes at C4-5 and C6-7, and mild degenerative facet changes. AR1187. On June 19, 2017, she was seen again, at which time her depression score was positive and physical therapy was prescribed for her neck. AR957, 964.

Ms. Flatequal saw Dr. Dierks on September 18, 2017, for her ongoing neck pain and myalgias, following her appointment with Dr. Wingate, an

orthopedic surgeon, who had recommended EMG testing as well as evaluation for fibromyalgia. AR949. Gabapentin was prescribed and she was referred to rheumatology. AR954. A DEXA bone scan obtained on September 20, 2017, revealed low bone density, significantly decreased since 2015, but not osteoporosis. AR1186.

Ms. Flatequal saw Dr. Dierks on November 20, 2017, for a preoperative exam prior to breast reduction surgery. AR1126. Dr. Dierks noted that Ms. Flatequal had just had hardware removed from her collarbone, had been diagnosed with fibromyalgia, and given her struggles with back and neck pain he felt the breast reduction surgery was a good plan. AR1126, 1128. Her Tramadol medication was refilled for pain. AR1128.

Ms. Flatequal saw physician's assistant Travis Slaba[3] on November 22, 2017, for significant clavicle pain following a pop over her left clavicle when reaching to pick something up. Examination revealed an inability to shrug her shoulders, significant decreased range of motion of the left shoulder, and severe discomfort on palpation of mid clavicle. AR1117. X-rays revealed a left clavicle fracture. AR1118. A sling, Toradol for pain, and a referral to the orthopedic clinic were given. AR1118.

Ms. Flatequal saw Dr. Dierks on December 20, 2017, to follow-up on her fibromyalgia, which she reported was worse, and water therapy was prescribed. AR1096, 1103.

_____

[3] The parties' joint statement of facts states that Ms. Flatequal saw Dr. Dierks on this date. See Docket No. 12 at p. 8, ¶34. However, the medical record is signed by PA Slaba. See AR1119.

On February 6, 2018, Dr. Dierks examined Flatequal and completed a medical source statement regarding her ability to physically function during a full-time workday. AR1193-95. Dr. Dierks opined that Ms. Flatequal would be limited to lifting less than 10 pounds occasionally or frequently, standing or walking less than two hours in an 8-hour workday, and she would need an option to alternate to a standing position every 30 minutes while sitting. AR1193. Dr. Dierks stated that Ms. Flatequal was limited in pushing or pulling in both her upper and lower extremities due to her shoulder, hip, and back issues, and she was limited to only occasional reaching, and frequent handling, fingering, and feeling. AR1194.

On February 6, 2018, Dr. Dierks examined Ms. Flatequal and completed a medical source statement regarding her mental ability to do basic work activity on a sustained, regular and continuing basis. AR1189-92. Dr. Dierks identified moderate limitations in identifying and solving problems, sequencing multi-step activities, using judgment to make work-related decisions, ability to keep social interactions appropriate, complete tasks in a timely manner, ability to ignore or avoid distractions, sustain an ordinary routine and regular attendance, and to adapt to change. AR1189-91. Dr. Dierks also identified marked limitations in Ms. Flatequal's ability to work a full day without needing more than the allotted number or length of rest breaks during the day and in her ability to manage her psychologically based symptoms. AR1191.

## 2. Avera Rheumatology Clinic:

Ms. Flatequal saw rheumatologist Jenna King, DO, on November 13, 2017, for evaluation of myalgias. AR900. Ms. Flatequal had already been started on gabapentin, but reported not noticing much difference with it, and had been tested for autoimmune disease and was found to have a negative rheumatoid factor CCP and HLA-B27. AR900. Ms. Flatequal was suffering from fatigue, sleep problems, pain, headaches, anxiety/depression, morning stiffness, tingling in her hands, IBS, spastic colon, cervical and lumbar osteoarthritis and myalgias. AR900. Ms. Flatequal was scheduled for a C7 nerve block injection the following week and a piriformis injection. AR900. Ms. Flatequal also reported having a lot of disorientation, and wasn't sure if that was due to the brain surgery for her tumor, and significant left hip pain. AR901, 903. Examination revealed full range of motion for all extremities, no joint swelling, normal reflexes, intact movement, normal sensation, and 11/18 muscle tender points. AR907. Dr. King's assessment was fibromyalgia, degenerative joint disease, and anxiety/depression. AR907. Dr. King stated that Ms. Flatequal had widespread pain with at least 11 out of 18 muscle tender points consistent with fibromyalgia, and recommended a combination of gabapentin, Cymbalta, and Flexeril. AR908.

## 3. Avera Neurosurgery Clinic:

Ms. Flatequal had brain surgery on March 30, 2016, to remove a small left posterior frontal dural-based meningioma. AR468-70, 606, 618. She was discharged from the hospital on April 3, 2016. AR464.

Ms. Flatequal was seen on July 14, 2016, for follow-up to her tumor surgery and reported having several psychiatric complaints, which were being addressed by her psychiatrist, and fatigue, poor energy level, and a sensation of "disconnect." AR745. She did not feel she was able to return to work.[4] AR745. An MRI obtained the same day revealed no evidence of tumor reoccurrence. AR747.

Ms. Flatequal had a 24-hour video EEG on December 27, 2016, due to spells of alteration of awareness, which was normal. AR1031.

Ms. Flatequal was seen on September 12, 2017, for a nerve conduction test due to bilateral hand pain and paresthesia, which revealed no convincing evidence of radiculopathy, plexopathy or mononeuropathy affecting the extremities. AR1033.

Ms. Flatequal saw neurologist Todd Zimprich, MD, on November 7, 2017, for evaluation of a cognitive disorder with spells of disorientation, memory difficulties, tremors, and weakness in the upper extremity, and headaches. AR984. Dr. Zimprich stated Ms. Flatequal's cognitive disorder was likely due to mental distraction. AR986. Ms. Flatequal saw Dr. Zimprich again on November 11, 2017, to test results which failed to identify an etiology for her neurologic symptoms. AR988. Dr. Zimprich noted that Ms. Flatequal was

_____

[4] The treatment note stated that Ms. Flatequal was referred to a Dr. Ripperda for a disability evaluation as Ms. Flatequal stated she could not return to work, but there are no records from a Dr. Ripperda or any other mention of him in the appeal record.

anxious with pressured speech, and she had a low amplitude, high frequency tremor in her bilateral upper extremities. AR988.

Ms. Flatequal saw Dr. Zimprich on November 22, 2017, for follow-up evaluation of a cognitive disorder with tremors and headaches, and spells of "disorientation." AR978. Ms. Flatequal complained of decreased energy, difficulty sleeping, depression/anxiety, left hip pain, lightheadedness, memory loss, headaches, left hand weakness, and left arm and leg paresthesias. AR978. Dr. Zimprich's assessments included migraines, stable; tremors, well-managed; meningioma with no clear residual, but some somatic symptoms may be associated; and cognitive disorder, likely multifactorial with a significant element associated with Ms. Flatequal's psychiatric disease and prior alcohol use, and may be a mild element associated with the meningioma. AR977.

### 4. Orthopedic Institute

Ms. Flatequal was seen on January 4, 2016, at Orthopedic Institute for a left mid-shaft clavicle fracture. AR702. Due to swelling and edematous, surgical intervention was not scheduled. AR702. Follow-up on January 15, 2016, showed restricted shoulder motion with significant pain with motion. AR701. Imaging revealed a displaced and shortened mid-shaft clavicle fracture and surgery was planned. AR701. Ms. Flatequal underwent an open reduction and internal fixation of the left midshaft clavicle on January 26, 2017. AR700, 704. Follow-up the following week showed she continued on pain medication but was doing well. AR699.

Ms. Flatequal was seen on March 9, 2016,for follow-up on her clavicle fracture and continued to do well, and had been essentially pain free over the clavicle and had full motion. AR698. On May 25, 2016, Ms. Flatequal was referred for physical therapy due to left shoulder pain and weakness, and limited range of motion. AR709. On June 10, 2016, Ms. Flatequal reported that she had some anterior shoulder soreness and tingling, but no pain in the shoulder, and her home therapy was going well. AR812.

Ms. Flatequal was seen on October 7, 2016, for right hip/buttock pain and weakness. AR801. Examination revealed diffuse pain with palpation over the gluteus musculature. AR801. Imaging revealed no abnormalities and she was referred for physical therapy. AR801-02.

Ms. Flatequal was seen on November 4, 2016, for physical therapy evaluation of right hip/buttock pain and weakness. AR810. Therapy continued through December [2016][5] and by December 14, 2016, Ms. Flatequal was not able to tolerate a stationary bike at level 3 for longer than four minutes. AR811.

Ms. Flatequal received a left piriformis injection and a cervical epidural steroid injection at Avera Hospital on November 14, 2017, by referral from Dr. Wingate. AR1344. She received the injections for neck and left upper extremity pain that radiated into her left hand with numbness and tingling to

---

[5] The parties' joint statement of facts at Docket No. 12 at p. 12, ¶48, contained the date "December 2017," but reference to AR811, the cited portion of the record, confirms this was a typographical error. AR811 is dated December, 2016. AR811.

the fingers.  AR1344.  Ms. Flatequal's pain was aggravated by activity.
AR1344.  Imaging revealed degenerative retrolisthesis leading to moderate
central canal stenosis at C6-C7 in addition to her prior fusion at C5-C6.
AR1344.  Examination revealed Ms. Flatequal was pacing and rearranging
chairs and her belongings, and she even needed to get up and do several small
tasks during the interview process.  AR1344.  Her cervical spine, paraspinous
musculature, trapezius, and rhomboid were all tender to palpation, and the left
greater trochanter into the piriformis and gluteal musculature were also
tender.  AR1344.

Ms. Flatequal underwent a revision open reduction and internal fixation
of her left clavicle on November 29, 2017, performed by Dr. Wingate.  AR1361.
Ms. Flatequal had a plate and screw removed from her prior clavicle surgery a
couple weeks earlier due to hardware prominence and she refractured her
clavicle.  AR1362.

Ms. Flatequal was referred by Dr. Wingate to Midwest Pain Specialists for
a left SI joint injection administered on December 22, 2017, due to buttock
discomfort and SI joint pain on the left side.  AR1044.

Ms. Flatequal was seen on March 1, 2018, by Dr. Wingate for follow-up
on her left clavicle.  AR1376.  She had the plate removed which had been put
in at her initial shoulder surgery, and following removal she refractured the
clavicle.  AR1376.  Dr. Wingate stated that he had also been seeing her for
buttock, leg and back symptoms and she had been through multiple rounds of

physical therapy, SI joint injections, epidural injections, and anti-inflammatory medications. AR1376.

Ms. Flatequal reported that her shoulder was doing well, but was concerned about her low back and buttock. AR1376. She had received a L5-S1 transforaminal epidural steroid injection on February 2, 2018, which had given her 100% relief, but only for a week. AR1376. She had pain in the L5 distribution and numbness and tingling all the way down to her foot. AR1376. Imaging revealed lumbar spondylosis, L5-S1 disc breakdown, degeneration of facet arthrosis and facet hypertrophy that causes foraminal stenosis on the left at L5-S1. AR1376.

Dr. Wingate stated Ms. Flatequal "has really been though everything" and discussed various surgical options. AR1376. A new lumbar MRI was ordered, and revealed lumbar degenerative disc disease most severe at L5-S1 without significant central canal stenosis and moderate neural foraminal stenosis on the left at L5-S1 with mild cord compression of the intraforaminal left L5 nerve root. AR1376, 1381.

On March 7, 2018, Dr. Wingate completed a medical source statement regarding Ms. Flatequal's physical functioning and stated she was limited to occasionally lifting 10 pounds, frequently lifting less than 10 pounds, standing and walking less than two hours in an 8-hour workday, and she must alternate sitting and standing every 30 minutes to relieve pain or discomfort. AR1377. Dr. Wingate also limited her to occasional balancing, kneeling and crouching and frequent reaching, handling and fingering. AR1378. Dr. Wingate stated

that he had not given her formal restrictions, and his recommendations were based on diagnosis and her currently physical state, including a healed clavicle fracture.  AR1379.

### 5.    Avera Behavioral Health

Ms. Flatequal was admitted to Avera Behavioral Health on an involuntary hold following a suicide attempt on July 24, 2015.  AR589.  Her admission diagnoses included major depressive disorder, suicide attempt, alcohol intoxication and use disorder, and unspecified anxiety disorder.  AR589.  Her treatment notes indicate that Ms. Flatequal had a history of a prior suicide attempt and inpatient treatment in 2005.  AR589, 593.  Ms. Flatequal requested discharge when the involuntary hold was lifted on July 26, 2015, and was released.  AR590.  She was noted to have limited insight on her problems, and it was recommended she follow-up with psychology and counseling.  AR590-91.

Ms. Flatequal participated in group and individual therapy for substance addiction at Avera beginning in August, 2015 and continuing through October, 2015.  AR524-58.  The initial diagnostic interview indicated Ms. Flatequal had previously received treatment for gambling addiction, lack of coping skills, stress management, and poor impulse control.  AR558.

### 6.    Avera University Psychiatry Associates

Ms. Flatequal saw Dr. Bergan at Avera University Psychiatry Associates on May 24, 2016, for depression.  AR728.  Ms. Flatequal reported mood swings, feelings of emptiness, and periods of impulsiveness.  Ms. Flatequal

reported prior suicide attempts by overdose resulting in stomach pumping, and closing her eyes and turning the wheels of her car resulting in a crash with both attempts occurring in the 1990's. AR729. She also reported shoulder/neck tension all the time, and being easily irritated on a daily basis. AR730. Ms. Flatequal reported a history that included her parents getting married and divorced twice, her mother leaving and never returning at age 13, being beat up by four men in college, giving birth to stillborn twin sons, a history of gambling addiction, multiple other miscarriages, inpatient treatment for alcoholism, divorce, and being robbed and tied up at gunpoint at a casino. AR730. Ms. Flatequal was diagnosed with major depressive disorder, moderate; alcohol use disorder, moderate; unspecified anxiety disorder; and borderline personality traits. AR731. Duloxetine was prescribed along with her current trazodone, and she was referred to the STEPPS program. Her mental status exam revealed dysphoric and anxious mood, fair insight and judgment. AR735-36.

Ms. Flatequal saw Dr. Bergan on June 28, 2016, and reported worrying whether a potential job would interfere with her ability to complete the STEPPS program. AR719.

Ms. Flatequal saw Dr. Bergan on October 7, 2016, for follow-up. AR783. Ms. Flatequal reported she had started the STEPPS program, but stopped when her father became ill, then restarted. AR783. She was seeing Chris Pudwill twice a month at Avera 33rd and Cliff, and she had an appointment with Carol Kuntz for neuropsychiatric testing. AR783. Dr. Bergan stated Ms. Flatequal

had created a self-fulfilling prophecy that she can't work, and he did not know whether she actually could or not.  AR785.  Dr. Bergen increased her duloxetine dosage.  AR786.

Ms. Flatequal participated in the STEPPS therapy program at Avera from October 24, 2016, through November 29, 2016.  AR1284-1321.

Ms. Flatequal was referred for a psychological evaluation at Great Plains Psychological Services on November 2, 2016, for an evaluation of cognitive and psychological functioning due to forgetfulness following her craniotomy and tumor resection the prior March, and she also complained of left-handed shakiness, fatigue, brief spells of lightheadedness, numb tingly left shoulder, as well as multiple joint aches and headaches.  AR755.

Dr. Whitten found that her mood/behavior was impaired and her psychomotor response was questionable.  AR755.  Dr. Whitten found no neuropsychological signs of her left hemisphere lesion lingering.  AR756. Dr. Whitten stated that similar individuals to Ms. Flatequal find returning to work a struggle, and cautioned the use of opioids, analgesics, benzodiazepines, and stimulant medications for pain control due to potential addiction issues.  AR756.

Ms. Flatequal saw Dr. Bergan on November 3, 2016, for follow-up. AR774.  Ms. Flatequal rated her mood 4/10, energy level was really bad, concentration not so good, and said her anxiety was terrible.  AR774-75.  She reported that she continued to see Chris Pudwell[6] every two weeks.

---

[6] There are no treatment records in the appeal record from Chris Pudwell.

Ms. Flatequal saw psychologist David Hylland on November 30, 2016, for a psychological evaluation. AR794. Ms. Flatequal reported she had tried about seven meetings at the STEPPS program but decided it would not work for her. AR794. She saw Dr. Hylland again on December 12, 2016, and he had obtained and reviewed the prior evaluation from Dr. Whitten. AR792. Dr. Hylland stated the test results showed that Ms. Flatequal had significant depression with anxiety, and it "shows that it is going to be very unlikely that she would have any success trying to carry on any type of occupation because of her depression and anxiety and her focus on the health that she has to keep staying on top of." AR792.

Ms. Flatequal saw Dr. Bergan on December 8, 2016, for follow-up. AR765. Ms. Flatequal rated her mood 5/10, was attending physical therapy for her hip, and concentration not very good. AR765-66. She had stopped seeing Chris Pudwell and was now seeing Dr. Hylland for individual therapy. AR768.

Ms. Flatequal saw Dr. Hylland on January 11, 2017, for therapy and discussed her disability application. AR934. Dr. Hylland stated, "...which I certainly believe she is qualified to receive." AR934. Dr. Hylland stated, "I hope that she does pursue the appeal of the social security disability denial because I think she certainly is incapable of having any type of full time job right now, or even part time, with her mental state and her physical health." AR934.

Ms. Flatequal saw Dr. Hylland on February 8, 2017, and again on March 8, 2017. AR932-33. At the March appointment, she was very emotionally

21

upset, very anxious, and quite tearful. AR932. She had been denied disability again. AR932.

Ms. Flatequal was brought to Avera Behavioral Health by the police on March 30, 2017, due to some anxiety issues. AR1326. Ms. Flatequal's husband called the police when he felt she took some pills. AR1326. She said it was a couple of ibuprofen, and that she was not suicidal. AR1326. Ms. Flatequal was observed to be quite tearful, worried, and anxious, and reported she was seeing a counselor. AR1326-27.

Ms. Flatequal saw Dr. Hylland for therapy on May 8, 2017, who stated again that he felt Ms. Flatequal met the criteria for being disabled from a mental health standpoint and probably from a medical standpoint. AR931. She continued CBT therapy. AR931.

Ms. Flatequal saw Dr. Bergan on May 11, 2017, for follow-up and reported she had been doing poorly, with increased anxiety to the point she almost can't breathe a couple of times per week. AR921. Ms. Flatequal had applied for MAWD and vocational rehabilitation, and had been volunteering at the Banquet. AR922. She continued to report daily episodes of disorientation. AR922. Dr. Bergan felt Ms. Flatequal was taking some helpful steps to start working. AR924.

Ms. Flatequal saw Dr. Bergan on August 10, 2017, for follow-up and reported she had qualified for vocational rehabilitation and was placed at Goodwill for a six-week period working in the back area scanning books, where she had no exposure to customers. AR912. She reported she continued to

22

have periods of disorientation that happens 3-4 days and last 1-30 minutes, but nobody at Goodwill cares.  AR912.  Ms. Flatequal reported that she had been in extreme back pain and had been miserable.  AR912.

Ms. Flatequal saw Dr. Bergan on November 2, 2017, and reported that she was doing CBT therapy with Dr. Nordgren, and that Dr. Nordgren thinks Ms. Flatequal's periods of disorientation are related to her panic attacks. AR1067.  Ms. Flatequal reported she had completed her six-week work assignment at Goodwill and had missed three days during that period. AR1067.

Ms. Flatequal saw Dr. Bergan on December 7, 2017, and had been assigned a job coach by vocational rehabilitation to help find a part-time job. AR1058.  Therapy from Dr. Nordgren is mentioned again. AR1060.

Ms. Flatequal saw Dr. Bergan on January 9, 2018, and was doing worse due to recovery from recent surgeries.  AR1050.  Therapy with Dr. Nordgren[7] is mentioned again.  AR1050.

Dr. Bergan completed a mental limitations form on February 7, 2018. Dr. Bergan opined that Ms. Flatequal had moderate limitations in her ability to sequence multi-step activities; handle conflicts with others; keep social interactions free from excessive irritability, sensitivity, argumentativeness, or suspiciousness; sustain an ordinary routine and regular attendance at work; respond to demands; adapt to changes; and to manage her psychologically

_____

[7] There are no therapy treatment notes from Dr. Nordgren in the appeal record.

based symptoms.  AR1096-99.  The form defined "moderate" as functioning in those areas on a sustained basis is fair.  AR1196.

### 7.    State Agency Assessments

The State agency physician consultant at the initial level on August 11, 2016, stated that Ms. Flatequal had severe other fracture of bones, benign brain tumor, and spine disorder, and non-severe hyperlipidemia and thyroid gland.  AR122.  The consultant projected that within 12 months after the onset, Ms. Flatequal would have made a full recovery with no limitations, so no RFC was assessed.  AR122.  The reconsideration level consultant on February 15, 2017, found that at that time Ms. Flatequal had no severe physical impairments so no RFC was assessed.  AR142-43.

The State agency psychological consultant at the initial level on August 5, 2016, found that Ms. Flatequal had non-severe affective disorder, non-severe anxiety disorder, and non-severe alcohol, substance addiction disorder, causing mild limitations in activities of daily living and in maintaining concentration, persistence or pace.  AR123.  The consultant did not assess mental RFC.  AR123.  The State agency expert at the reconsideration level stated Ms. Flatequal had severe affective disorder, severe anxiety disorder, and non-severe alcohol, substance addiction disorder.  AR143.  The reconsideration level expert found on February 24, 2017, that Ms. Flatequal had mild restrictions in understanding, remembering or applying information; moderate difficulties in interacting with others; moderate difficulties in maintaining

concentration, persistence or pace; and mild limitations in adapting or managing oneself.  AR143.

The consultant found that Ms. Flatequal had moderate limitations in carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday and work week without interruptions from psychologically based symptoms, and performing at a consistent pace without unreasonable number and length of rest periods. AR146.  The consultant also found Ms. Flatequal was moderately limited in her ability to interact appropriately with the general public, and respond appropriately to changes in work setting.  AR146.  The consultant found that Ms. Flatequal was "able to persist at lower level moderately complex tasks with reduced contact with others within physical limitations."  AR147.

**D.      Testimony at ALJ Hearing**

**1.      Ms. Flatequal's Testimony**

Ms. Flatequal testified she was left-handed.  AR72.  Ms. Flatequal testified she was having a lot of pain and numbness in her left leg and left buttock.  AR80.  She said she tried physical therapy, pool therapy, takes narcotic pain medication: tramadol and oxycodone, and had three steroid injections, and nothing had helped for long.  AR80-81.  Ms. Flatequal testified it interferes with her standing, sitting, and sleeping.  AR81.  Ms. Flatequal testified that she had already had prior surgery on her upper back.  AR82.  She said she could stand or sit about 30 minutes before needing to alternate, but she could not continue that for a full work day due to pain.  AR100-01.

Ms. Flatequal testified that she had periods of disorientation several times a day since her brain surgery. AR83. She said the disorientation lasts from a few minutes to a couple of hours. AR83. Ms. Flatequal testified that while working her assigned jobs at Goodwill, she missed two full days and three half days of work during the six-week period due to her periods of disorientation. AR84. During the second six-week period at Goodwill she said she missed one full day due to disorientation and pain. AR103. Ms. Flatequal said Goodwill also allowed her to take a break or time out when she had spells. AR105.

Ms. Flatequal testified that her breast reduction surgery had helped with her upper back pain, but she still had some tingling in her arms and a little weakness in her left hand. AR84. Ms. Flatequal testified that she had fibromyalgia that caused a lot of body pain and fatigue. AR84-85.

Ms. Flatequal testified to a long history of depression with medication since 1991. AR87. She said she had low mood, mood swings, isolation feelings, sadness, crying spells, and had attempted suicide in 2015. AR87-88. She testified that she had panic attacks daily, which causes her to sweat and hyperventilate, and she is receiving cognitive physical therapy weekly from her psychologist. AR89-90. Ms. Flatequal testified that she saw her psychologist, Dr. Nordgren, weekly for treatment. AR91.

Ms. Flatequal testified that she had difficulty taking baths due to her hip, that she did some cooking, that she could not vacuum, and depending on her

level of pain, she could wash clothes.  AR96.  She said that when she drives she stops about every half hour due to pain.  AR97.

### 2.  Vocational Expert Testimony

The ALJ asked the VE a hypothetical that incorporated the limitations identified in the RFC, and the VE testified the individual would not be able to perform Ms. Flatequal's past work, but could perform the occupations of copy machine operator, DOT# 207.685-014; mail clerk, DOT# 209.687-026; and clerical checker, DOT# 222.687-010, and provided numbers of jobs available nationally for each.  AR108-10.  The VE testified that an individual who missed more than one to two days per month or was late or left early more than one to two days per month would be unemployable.  AR111, 113.

### 3.  Other Evidence

Evidence from vocational rehabilitation documents that when Ms. Flatequal worked between September 11, 2017, and October 25, 2017, she missed three days of work and was late one time.  AR347.  Evidence from vocational rehabilitation documents that when working at Goodwill she reported feeling disoriented at times and she was allowed to take a break or lay down during those periods.  AR381.  Other evidence from vocational rehabilitation documents that Ms. Flatequal missed two days while working at Goodwill due to getting disoriented.  AR387.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze

the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)

(citations omitted).

The court must also review the decision by the ALJ to determine if an

error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311

(8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether

the ALJ applied an erroneous legal standard in the disability analysis.

Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d

852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions

of law are only persuasive, not binding, on the reviewing court. Smith, 982

F.2d at 311.

## B.    The Disability Determination and the Five-Step Procedure

Social Security law defines disability as the inability to do any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve

months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[8] The

impairment must be severe, making the claimant unable to do his previous

work, or any other substantial gainful activity which exists in the national

economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

---

[8] Although Ms. Flatequal has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the corresponding Title XVI regulation is identical. It is understood that both Titles are applicable to Ms. Flatequal's application. Any divergence between the regulations for either Title will be noted.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. <u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. <u>Heckler v. Campbell</u>, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his

past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D.    The Parties' Positions

Ms. Flatequal asserts the Commissioner erred at step four in formulating her residual functional capacity ("RFC") by: (1) not properly determining the functional limitations imposed by her fibromyalgia ("FM"), and (2) by not

properly weighing the medical opinion evidence. Ms. Flatequal also alleges the Commissioner erred at step five in: (3) failing to resolve conflicts between the Dictionary of Occupational Titles (DOT) job descriptions and the ALJ's hypothetical, and (4) by failing to substantiate how many of the identified occupations existed in Ms. Flatequal's region or in several regions of the country. The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and the decision should be affirmed.

## E.  Step Four—Formulating RFC

### 1.  Law Applicable to Step Four

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996). Although the

ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[9] Lauer, 245 F.3d at 703 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

---

[9] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental

34

activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

A finding at step two or step three that a claimant has an impairment or limitation does not "magically disappear when the analysis moves to step four." Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015). However, just because a limitation is found at an earlier step also does not mean there automatically must be a corresponding functional limitation in the RFC formulated at step four. Id. Instead, the limitations found at step two or three should be considered when formulating RFC, but they do not "automatically translate into limitations on the claimant's ability to work." Id. The question is whether substantial evidence in the record as a whole supports the ALJ's RFC formulation. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).

### 2. Fibromyalgia

Ms. Flatequal asserts in her briefing that the ALJ only mentioned Ms. Flatequal's fibromyalgia ("FM"), once and then a second time only in passing. See Docket No. 16 at pp. 2-3. This is a mischaracterization of the record which does not further Ms. Flatequal's cause.

The ALJ actually mentioned Ms. Flatequal's FM several times in its opinion. Furthermore, the primary symptom Ms. Flatequal attributed to her FM was all-over body pain and the ALJ also discussed her pain symptoms several times.

The ALJ found at step two of the analysis that Ms. Flatequal's FM was a severe impairment. AR18. At step three, the ALJ discussed whether

Ms. Flatequal's FM met or medically equaled an analogous Listing (FM does not have its own Listing). AR19. In this regard, the ALJ noted that Ms. Flatequal's FM did not show repeated manifestations resulting in marked limitations of activities of daily living ("ADL"), maintaining social functioning, and completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. AR19. The ALJ noted that physical examinations of Ms. Flatequal did not show disorganized motor function in two extremities resulting in extreme limitation in the ability to stand up from a seated position, to balance while standing or walking, or in the use of upper extremities persisting for at least three consecutive months. Id.

The ALJ noted at step four that Ms. Flatequal testified she experiences pain all over her body due to FM and arthritis. AR22. The ALJ noted Ms. Flatequal testified she can stand for a total of no more than four hours of an eight-hour workday due to pain and disorientation. Id. The ALJ noted that, despite her complaints of pain due to FM and due to spinal conditions, Ms. Flatequal walked without any assistive device and did not appear to be in distress. AR23.

The ALJ credited Ms. Flatequal's complaints of chronic pain due to FM, noting a rheumatology evaluation found she had 11 tender points and widespread pain. AR23. However, Ms. Flatequal's rheumatologist recommended conservative treatment of low-impact aerobic exercise, cognitive behavioral therapy, and medications. Id. And Ms. Flatequal's primary care physician prescribed water therapy for her FM. AR24. The ALJ noted no

medical professional prescribed an assistive device for walking due to chronic pain or dizziness. Id.

The ALJ then compared Ms. Flatequal's complaints of pain due to FM and her back condition to the ADLs Ms. Flatequal regularly engaged in. Id. These ADLs included reading, writing, performing simple math, managing her own money, watching television and understanding the plot, going on Facebook now and then, going to church sometimes, dressing herself, bathing and showering herself, doing all household chores except vacuuming, and driving for 30 minutes at a time. The ALJ concluded the physical and mental demands of Ms. Flatequal's ADLs were consistent with the RFC it formulated and not consistent with Ms. Flatequal's allegations of disabling symptoms. Id.

The ALJ mentioned Ms. Flatequal's FM again when it gave no weight to state agency medical consultants' conclusions that her FM did not amount to a severe physical impairment. AR25. The ALJ specifically stated that its RFC assessment took into account Ms. Flatequal's diagnoses as well as "the nature and effects of chronic pain." AR27. But, ultimately, the ALJ concluded the longitudinal medical record and Ms. Flatequal's ADLs supported the RFC it formulated.

Ms. Flatequal asserts the ALJ failed to cite or to follow SSR 12-2p, the agency's guidance for evaluating FM.[10] SSR 12-2p contains specific guidance for evaluating a claimant's statements about her FM symptoms and the

_____

[10] Ms. Flatequal correctly acknowledges the ALJ's mere failure to cite SSR 12-2p is not fatal. But she asserts that, in addition to not citing the ruling, the ALJ misunderstood fundamentally the nature of FM.

resulting functional limitations.  <u>See</u> SSR 12-2p at § IV.  The Commissioner

sets forth a two-step process for FM, which is the same process used for

evaluating claimants' testimony with regard to any other impairments:  (1) first

determine if there are medical signs and findings demonstrating the claimant

has a medically-determinable impairment which could reasonably be expected

to produce the pain or other symptoms alleged and (2) evaluate the intensity

and persistence of the pain or other symptoms to determine the extent to which

the symptoms limit the claimant's capacity for work.  <u>Compare</u> SSR 12-2p § IV

<u>with</u> SSR 16-3p and 20 C.F.R. § 404.1529 (setting forth the procedure

generally for evaluating a claimant's testimony about symptoms with regard to

all impairments).

As to the first prong, the ALJ found Ms. Flatequal did have a medically

determinable impairment could reasonably be expected to produce the pain

symptoms she alleged.  <u>See</u> AR23.  On the second prong, however, the ALJ

concluded Ms. Flatequal's description of the disabling effects of her pain were

not entirely consistent with the whole of the medical evidence and with other

evidence in the record, especially her ADLs.  AR23-26.

SSR 12-2p teaches regarding the second prong that the ALJ must

consider objective medical evidence regarding FM, but also must consider the

claimant's own statements about the intensity, persistence, and functionally

limiting effects of her symptoms.  <u>See</u> SSR 12-2p § IV.  In addition, the ALJ

must consider all the other evidence in the record, including the claimant's

ADLs, medications or other treatments the claimant receives for FM, the nature

and frequency of the claimant's attempts to obtain medical treatment for FM, and statements by others about the claimant's symptoms.  Id.  The Commissioner instructs ALJs to consider the longitudinal medical record with regard to FM when assessing RFC at step four because symptoms of FM can wax and wane over time.  SSR 12-2p at § VI, D.  The Commissioner instructs ALJs to be alert to nonexertional impairments with FM that may erode a claimant's vocational options.  Id. at § VI, E, 1 & 2.  Such nonexertional impairments may include fatigue, mental limitations because of pain or other symptoms, or environmental restrictions.  Id.

Ms. Flatequal testified at the hearing before the ALJ she had no problems reading, writing and doing simple math.  AR72-73.  She stated she managed her own money.  AR73.  After her date of alleged onset of disability, she worked for Goodwill in 2017 for two six-week sessions as part of a vocational rehabilitation program.[11]  Id.  The first time she worked in a warehouse at a computer scanning books to determine if they could be resold or should be thrown away.  Id.  The second session she worked in the Connection Center answering the phone and greeting people when they would come in to look for jobs online.  AR74.

During her first try at Goodwill, she missed two full days of work and three half days of work due to disorientation episodes.  AR102.  During her

---

[11] The first session was from July 17 to August 25, 2017, and the second was in September 11 to October 25, 2017.  AR347, 352, 365-70, 381.  The ALJ held Ms. Flatequal was not working at an SGA level during her times at Goodwill.  AR17.

second period at Goodwill, she missed one day of work due to disorientation. AR103. Ms. Flatequal testified she would not be able to perform the Goodwill computer-book-scanning job full time because it required that she sit in a chair constantly and type in numbers. AR106. She stated her pain and concentration problems would not enable her to do this first job. Id. She did not testify as to whether she could perform the receptionist/greeter job full time. Id.

The last regular full-time permanent job Ms. Flatequal had was as a corporate sales manager for a hotel from August, 2014, to July, 2015. AR78. Ms. Flatequal testified she was terminated from this position because she lost a master key for one of the hotels and because she missed some work due to illness. Id.

Ms. Flatequal testified her most severe physical problem was currently pain and numbness in her left leg and buttock, for which she was seeing an orthopedic surgeon. AR80. Ms. Flatequal said the problem had been bothering her for over two years. Id. She had sought physical therapy, pool therapy, and steroid injections for the left leg/buttock pain and was now considering surgery. Id. She also was prescribed narcotic pain medications lately for the issue. AR81. She testified this problem interfered with her standing, sitting and sleeping. Id. She rated this pain at a 6 or 7 on a 10-point scale, with or without medication. Id. Ms. Flatequal related this pain in her left leg/buttock to her previous spine surgery and to her spinal issues and spinal arthritis. AR82.

Ms. Flatequal also testified she had episodes of feeling disoriented which she believed was a residual effect of her brain tumor surgery.  AR83.  She testified she never had these periods of disorientation prior to her brain surgery.  Id.  She indicated the disorientation interferes with her activities and driving.  Id.  These episodes last anywhere from five minutes to a couple hours.[12]  Id.  The longer periods of disorientation occurred approximately twice per week.  Id.  Ms. Flatequal testified she missed quite a bit of work at Goodwill during her first six-week period due to these episodes of disorientation and that was why she was asked to try a second six-week period of work. [13]  AR84.

She also associated difficulties concentrating with her brain surgery, testifying that she had no problems concentrating prior to that surgery.  AR94-95.  Ms. Flatequal testified her difficulties concentrating were a separate problem from the periods of disorientation she described.  AR103.

Ms. Flatequal testified she had been diagnosed with FM for the first time a year before the ALJ hearing.  AR85.  She testified FM causes her a lot of body pain and fatigue.  AR84-85.  She testified she has had 15 surgeries and that she has a lot of body pain from those surgeries, as well as from her back

---

[12] This contrasts with what she told Dr. Bergan—that they lasted from 1 to 30 minutes.  See AR912.

[13] The court is not convinced Ms. Flatequal "gave it her all" with this first job attempt at Goodwill.  Contemporaneous medical records indicate she felt like a "loser" working at Goodwill, felt she was "way better than this," wanted to quit, was critical of the managers because they had "issues," and did not talk to anyone at the workplace for four weeks.  AR912.  She also told Dr. Bergan that, while she experienced episodes of disorientation at Goodwill which lasted from 1 to 30 minutes, it was "okay as nobody there cares."  Id.

conditions. AR85. When asked to rate her FM pain, Ms. Flatequal testified she was unable to quantify it because she feels pain from multiple causes and it is difficult to separate them. Id. Overall, lumping all her pain from all her sources into one, she reiterated her previous testimony that her pain was a 6 or 7 out of 10, with or without medication. Id. She testified this pain keeps her in bed all day an average of two days per week. AR100.

Ms. Flatequal testified she had access to healthcare. AR74-75. She testified she takes one medication at bedtime for FM. AR86. She testified it did not make a difference in her pain. Id.

Ms. Flatequal testified that she suffers from depression and has for about 25 years. AR87. One of the symptoms of her depression is fatigue. Id. Ms. Flatequal agreed with the ALJ when he suggested she had held skilled and demanding jobs over the course of her 25 years of depression and earned fairly decent money during those years despite this symptom of fatigue. AR92.

Ms. Flatequal asserts there are a whole host of co-occurring symptoms of FM that she suffered from which the ALJ failed to take into account in formulating her RFC. Specifically, she claims the ALJ failed to take into account her FM symptoms of fatigue, sleep problems, pain, headaches, anxiety/depression, morning stiffness, tingling in her hands, irritable bowel syndrome ("IBS"), spastic colon, cervical and lumbar osteoarthritis, and myalgias. See Docket No. 14 at pp. 5-6.

But Ms. Flatequal testified she has suffered from depression for 25 years and that fatigue is one of the symptoms she has experienced as a result.

AR87.  As the ALJ pointed out at the hearing, throughout this 25-year history of depression-related fatigue, Ms. Flatequal was able to maintain full-time employment at a relatively high level of compensation.  AR92.  In addition, Ms. Flatequal did not indicate any functional limitations from fatigue in her function report (AR265-72), and she did not testify to any functional limitations from fatigue at the ALJ hearing (AR66-106).  She did tell Dr. Whitten and Dr. Bergen she napped every day (AR719, 729, 892-93, 1048), but both of those doctors discounted her reports, opining that she was exaggerating her symptoms and was capable of working.  AR892-93, 1199.  Substantial evidence supports the ALJ's determination that fatigue does not render Ms. Flatequal disabled.

Ms. Flatequal also disassociated her sleep disturbances from FM when she testified they are the result of the pain and numbness in her left leg/buttock as a result of her spine condition.  AR81-82.  She testified she never experienced anxiety until immediately after her March, 2016, brain tumor surgery. AR89-91.  These symptoms now being alleged in this appeal to be FM symptoms in reality predated Ms. Flatequal's diagnosis of FM by years and, in some cases, decades.  She was first diagnosed with FM in November, 2017.  AR900.

When asked to testify to her disabling impairments and their symptoms, Ms. Flatequal attributed her episodes of disorientation and difficulties concentrating directly to her brain tumor and resulting surgery, not to her FM

diagnosis, which FM diagnosis occurred 18 months after the brain surgery. Furthermore, Ms. Flatequal underwent testing on November 2, 2016, with Dr. Richard Whitten (AR892-93), and November 22, 2017, with Dr. Todd Zimprich (AR977-90), due to her disorientation and concentration complaints.

Dr. Whitten conducted neuropsychiatric testing and concluded Ms. Flatequal was "over-reporting . . . emotional difficulties and pain." AR892. He concluded her standardized self-report inventory of mood and temperament was "unlikely, and non-credible somatic and cognitive symptoms." AR893. Dr. Whitten concluded Ms. Flatequal's brain tumor surgery was not causing any cognitive or mental impairments. AR892-93.

Dr. Zimprich, a year later, conducted a battery of neurological tests and concluded that Ms. Flatequal's cognitive disorder was likely due predominantly to her psychiatric disease and prior alcohol abuse. AR977-78, 985-86. He noted the chronic overuse of alcohol is directly associated with cognitive decline.[14] Id.

---

[14] Ms. Flatequal had in the past attended inpatient and outpatient treatment programs for alcohol abuse in 1997 and 2015 and was diagnosed with alcohol use disorder. AR892, 911, 913. There is conflicting evidence in the record about whether she was abstaining from all alcohol use at the times in question or was using alcohol. AR22, 911. The ALJ did not make a materiality determination about Ms. Flatequal's alcohol use because he concluded she was not disabled. AR25. This may need revisiting upon remand. "A claimant is not entitled to disability benefits where alcoholism or drug addiction materially contributes to the claimant's disability. 42 U.S.C. § 423(d)(2)(C). Where medical evidence of a claimant's drug addiction exists, the Commissioner must determine if the additional is a material factor in the claimant's disability. See Rehder v. Apfel, 205 F.3d 1056, 1059-60 (8th Cir. 2000); 20 C.F.R. § 404.1535 (2002). If the Commissioner determines that the claimant would still be disabled absent alcoholism or drug addiction, the

The ALJ did not "fail to note" that these other symptoms were FM symptoms. Ms. Flatequal and the medical records affirmatively asserted these symptoms were the result of other co-occurring impairments, not her FM.

In addition, the ALJ did consider Ms. Flatequal's gastrointestinal FM symptoms when he discussed her diverticulitis. AR18. He found this impairment to be non-severe and concluded it caused no more than minimal limitations on claimant's functioning. Id. This is supported by Ms. Flatequal's own testimony—she never mentioned these symptoms (neither diverticulitis, IBS, nor spastic colon), as impairing her functioning at the ALJ hearing or in her function report. AR66-106, 265-72.

But, finally, the ALJ formulated Ms. Flatequal's RFC, including symptoms from her FM, based on her ADLs and the medical evidence. AR27. For example, although Ms. Flatequal complained of difficulty concentrating, her neuropsychological testing showed normal memory and learning ability. AR19. The neuropsychiatric testing suggested any cognitive issues were due to mood disorder, not FM. AR20. The testing showed normal concentration and attention. Id. Ms. Flatequal was able to perform all self-care and all household tasks except vacuuming. AR23-24. Ms. Flatequal did not require assistive devices to walk, did not appear in distress, and had normal range of motion and motor strength with normal gait. AR23. The ALJ noted that Ms. Flatequal engaged in water therapy for her FM as well as for her shoulder. AR24.

---

claimant is entitled to benefits." Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002).

The ALJ did credit Ms. Flatequal's complaint of FM pain and, for that reason, limited her to no more than light physical exertional work activities. AR23. The ALJ specifically stated it was taking into account the nature and effects of chronic pain. AR27. However, the longitudinal record, and the inconsistencies between Ms. Flatequal's testimony and the ADLs and medical records, lead the ALJ to discount her reports of her symptoms to some extent. AR23-24, 27.

The court concludes the ALJ did not fundamentally misunderstand or misconstrue Ms. Flatequal's FM. Although the ALJ did not specifically mention SSR 12-2p, he analyzed the facts in accordance with the Commissioner's teaching in that SSR. Whether the ALJ's RFC withstands scrutiny overall is addressed in the next section of this opinion.

### 3.  Weighing Medical Evidence

Ms. Flatequal also alleges the ALJ erred in formulating her RFC by not giving proper weight to the opinions of Dr. Dierks and Dr. Wingate, both treating medical sources. Medical opinions are evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC. See 20 C.F.R. § 404.1527. All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined the claimant;

--whether the person giving the medical opinion treated the claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion.  20 C.F.R. § 404.1527(c).  "[I]f 'the treating

physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527)); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (citing Casey v. Astrue, 503 F.3d 687 at 691-692 (8th Cir. 2007)). The ALJ

must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. 404.1527(c)(2).

Certain ultimate issues are reserved for the Agency's determination. 20 C.F.R. § 416.927(e). Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination." House, 500 F.3d at 745 (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). See 20 C.F.R. § 404.1527(d). The ultimate issues reserved to the Agency are as follows:

1. whether the claimant is disabled;

2. whether the claimant is able to be gainfully employed;

3. whether the claimant meets or equals a Listing;

4. what the claimant's RFC is; and

5. what the application of vocational factors should be.

See 20 C.F.R. § 404.1527(d)(1) and (2); see also Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009) (ALJ need not adopt physician's opinion on the ultimate issue of whether claimant can work); Wagner, 499 F.3d at 849 (same); Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998) (same). The RFC determination is specifically noted to be one of those determinations that are an ultimate issue for the Agency to determine. 20 C.F.R. § 404.1527(d)(2); Cox v. Astrue, 495 F.3d 614, at 619-620 (8th Cir. 2007).

Ms. Flatequal's claim was filed in February, 2016. As to claims filed with the SSA *after* March 27, *2017*, the regulations regarding acceptable medical

sources, medical opinions, and how the SSA must articulate the way it weighs the medical evidence, have been completely re-written. See 20 C.F.R. §§ 416.920c, 404.1520c. Under those new regulations, a treating physician's opinion will no longer be given controlling weight. Instead, the supportability and consistency of an opinion will be the paramount factors for the ALJ to consider when evaluating a medical opinion. Compare: 20 C.F.R. § 404.1520c (applicable to claims filed on or after March 27, 2017) to 20 C.F.R. § 404.1527(c) (applicable to claims filed before March 27, 2017). See also: https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html. Ms. Flatequal discusses the new regulation at length in her brief seemingly assuming that the new regulation applies in her case (see Docket No. 14 at pp. 7-8), but the court finds the new regulation inapplicable to her claim by the very terms of the new regulation—i.e. it only applies to claims filed *on or after* March 27, 2017, which excludes Ms. Flatequal's 2016-filed claim.[15]

### 1.    Dr. Scott Dierks

Dr. Dierks was Ms. Flatequal's primary care physician. See Docket No. 12 at p. 6, ¶25. He prescribed medication for her depression at her request in 2015. Id. But he also treated her primarily for physical ailments such as gastrointestinal distress, post-operative care for her broken shoulder, hip and

---

[15] The cases cited in Ms. Flatequal's brief also involve pre-2017-filed applications for disability benefits: See, e.g. Holohan v. Berryhill, 2018 WL 2289275 at *1 (E.D. Mo. May 18, 2018); Woodruff v. Berryhill, 2017 WL 4237015 at *1 (E.D. Mo. Sept. 25, 2017) (both involving applications filed with SSA in 2013). Therefore, the new regulations were not applicable to these cases either.

knee pain, arthritis in her hip, ankle pain, low back pain, and neck and trapezius pain.  Id. at pp. 6-9.  On February 6, 2018, Dr. Dierks rendered opinions as to Ms. Flatequal's physical and mental functional abilities.  AR1189-95.  Ms. Flatequal takes issue only with the ALJ's treatment of Dr. Dierks' opinion concerning her physical abilities.  See Docket No. 14 at pp. 9-10.

Dr. Dierks' opinion was that Ms. Flatequal could not even perform the full range of sedentary work.  AR26, 1193-95.  Dr. Dierks completed the check-box form jointly with Ms. Flatequal.  AR1195.  He opined she could never lift more than 10 pounds, could stand or walk less than 2 hours in an 8-hour day, could sit if allowed to periodically alternate sitting and standing every 30 minutes to relieve pain, and was limited in the ability to push/pull with both upper and lower extremities due to her shoulder and hip issues.  AR1193-94.

Dr. Dierks opined Ms. Flatequal could occasionally climb stairs, balance and kneel, rarely stoop or crouch, and never climb ladders or scaffolds.  AR1194.  He opined she could occasionally reach in all directions including overhead, and could frequently handle, finger and feel.  Id.  Dr. Dierks opined Ms. Flatequal's near and far visual acuity was limited.  AR1195.  Environmentally, Dr. Dierks opined Ms. Flatequal should avoid concentrated exposure to wetness, avoid moderate exposure to vibration, and avoid all exposure to extreme heat or cold, humidity, noise, fumes, and hazards, machinery and heights.  Id.

Dr. Dierks' opinion was contradicted by Ms. Flatequal herself at the hearing when she testified she could sit or stand for 4 hours out of an 8-hour workday if allowed to alternate between sitting and standing, while Dr. Dierks opined she could only do so for *less than* 2 hours. Compare AR101 with AR1193.

The ALJ discounted Dr. Dierks' opinion, giving it only partial weight, because some of his own records and records from other medical sources showed Ms. Flatequal had full range of motion of her extremities, appropriate muscle strength, full sensation, and normal gait. AR26 (citing exhibits 4F at p. 56; 11F at p. 6, 15; 14F at p. 14; 16F at pp. 37-38; 17F at pp. 2, 9, 12; 29F at p. 6; and 34F at p. 6).

Ms. Flatequal argues the ALJ never explained *why* these findings ostensibly contradict Dr. Dierks' opinion. She argues these findings may indeed be entirely consistent with Dr. Dierks' opinion.

For example, Ms. Flatequal argues a finding of normal strength may not take into account that some of Ms. Flatequal's impairments may cause weakness. See Docket No. 14 at pp. 9-10. This argument appears nonsensical. A finding of normal strength appears directly contradictory to a finding that one is experiencing weakness. The court agrees with the ALJ that a finding of normal strength belies an alleged weakness due to impairment.

Also, Ms. Flatequal asserts just because her shoulder has healed and she has normal range of motion in that joint, she may still experience weakness, pain, "or simply the need to reduce exertion and repetition with the shoulder to

52

preserve its current condition and avoid re-injury to the weakened joint." Id. at p. 10. She argues the ALJ did not take this into consideration. For good reason—Ms. Flatequal did not testify to any functional limitations as a result of her shoulder at the hearing. AR66-106.

In her written function report, which was completed two years before the ALJ hearing and only a few months after her first clavicle fracture, Ms. Flatequal did report pain and limitations in her shoulder, but it is clear this resolved. AR266-72. Four months after her re-fracture of the clavicle was surgically repaired, she reported to her orthopedist on March 1, 2018, that her shoulder was doing well. AR1376. The orthopedist, Dr. Wingate, recorded on this date she had "great" range of motion and "great" strength. Id. Dr. Wingate reported her shoulder "had healed well" and that she had "no complaints whatsoever as far as her clavicle is concerned." Id. This was shortly before the March 16, 2018, ALJ hearing at which Ms. Flatequal did not testify to any limitations or pain associated with her shoulder.

Furthermore, as discussed below, although Dr. Dierks' opinion was that Ms. Flatequal could never lift more than 10 pounds (AR1193), Dr. Wingate, her orthopedist who was actually the specialist who treated and repaired Ms. Flatequal's shoulder, opined she *could* lift 10 pounds occasionally and less than 10 pounds frequently (AR1377). "Occasionally" is defined as from 6% to up to 33% of a normal working day while "frequently" means from 34% to 66% of the working day. AR1377.

Dr. Dierks' opinion as to reaching, handling, fingering and feeling was also contradicted by Dr. Wingate's opinion.  Dr. Wingate opined Ms. Flatequal could do all these activities at the highest level—frequently—as opposed to Dr. Dierks' opinion she could reach only "occasionally."  AR1378.  Dr. Dierks' opinion as to limitations in pushing and pulling was also contradicted by Dr. Wingate's opinion Ms. Flatequal was *un*limited in these activities.  AR1378.

As between Dr. Dierks and Dr. Wingate, both were treating physicians, both treated Ms. Flatequal for her physical conditions that caused symptoms, especially her leg/buttock impairment and her shoulder impairment, but Dr. Dierks is a general practitioner while Dr. Wingate is a specialist in the area implicated by these impairments—orthopedics.  It was Dr. Wingate who operated on Ms. Flatequal's clavicle fracture the second time and Dr. Wingate who referred Ms. Flatequal for physical therapy for her leg/buttock impairment and for steroid injections for that impairment as well as cervical pain.  AR801-02, 1044, 1344, 1376.  It was Dr. Wingate who ordered imaging of Ms. Flatequal's shoulder and spine and reviewed those images.  Id.

Furthermore, Dr. Wingate's physical RFC opinion was issued based on a physical examination of Ms. Flatequal which he conducted just six days prior to issuing his opinion.  Compare AR1376 with AR1377-79.  At that examination, Dr. Wingate actually conducted a neurological examination of her upper and lower extremities, her motor strength, and her ambulation.  AR1376.

Although Dr. Dierks also examined Ms. Flatequal near to the date of his opinion on her physical RFC,[16] that examination was limited to looking in her ear, examining her thumbnail, and examining a chest rash that had resulted from surgical tape being applied. AR1096-1103. Dr. Dierks did no contemporaneous examination of Ms. Flatequal's physical or neurological functioning, strength and limitations at the time he rendered his physical RFC opinion nearly 3 months later. No such examination by Dr. Dierks appears in the record for 8 months preceding his rendering of his physical RFC opinion.[17]

The ALJ was following the law when he gave less weight to Dr. Dierks' opinion and more weight to Dr. Wingate's. Dr. Wingate's opinion was based on actual contemporaneous examination of Ms. Flatequal proximate to the date of the ALJ hearing, Dr. Wingate's opinion was in the realm in which he has specialized knowledge, and his opinion was more consistent with the record as a whole, including Ms. Flatequal's own testimony. See 20 C.F.R. § 404.1527(c); Wagner, 499 F.3d at 848. The ALJ's weighing of Dr. Dierks' opinion is supported by substantial evidence in the record as a whole and is free from legal error.

## 2. Dr. Matthew Wingate

---

[16] Dr. Dierks examined Ms. Flatequal in December, 2017, and he rendered his opinion February, 2018.

[17] Dr. Dierks examined Ms. Flatequal on November 20, 2017, to clear her for breast reduction surgery; his exam did not include any measure of physical functional ability. AR1126. Neither did his exam on September 18, 2017. AR954. The exam most proximate to his RFC opinion that included an assessment of gait, range of motion, balance and swelling was June 7, 2017, eight months before rendering his physical RFC opinion. AR972.

Dr. Wingate's physical RFC opinions are recited above. If fully credited, Dr. Wingate's opinion would limit Ms. Flatequal to performing sedentary work, whereas the ALJ's RFC indicated Ms. Flatequal was capable of performing the higher exertional category of light work. Compare AR1377-79 & SSR 96-9p (setting forth sedentary work parameters), with AR21 (ALJ's formulation of light work RFC). The ALJ gave "partial weight" to Dr. Wingate's opinion. AR26.

The ALJ stated as reasons for discounting Dr. Wingate's opinion (1) the doctor stated he had not assigned any formal restrictions; (2) the doctor's own exam of Ms. Flatequal a few days before he issued his RFC opinion showed her upper and lower extremities were neurologically intact, she had 5/5 motor strength, and ambulated normally; and (3) the doctor stated her shoulder had fully healed and had great range of motion and strength. AR26. The variances between the ALJ's RFC and Dr. Wingate's are as follows:

| FUNCTION | DR. WINGATE | ALJ |
|---|---|---|
| Lift/carry | 10 pounds occasionally, Less than 10 pounds frequently | 20 pounds occasionally, 10 pounds frequently |
| Sit | Unspecified, but must alternate between sitting and standing every 30 minutes | 6 hours in a normal day |
| Stand | 2 hours in a normal day | 6 hours in a normal day |
| Push/pull | Unlimited | Occasionally with resistance no more than 20 pounds |
| Stoop | Rarely | Occasionally |

The ALJ did not specify Ms. Flatequal's ability to reach, handle, finger, or feel in its opinion.[18] AR21. Dr. Wingate opined she could perform all of these functions frequently. AR1378. Both opined Ms. Flatequal should avoid hazardous moving machinery and heights. AR21, 1379.

Ms. Flatequal testified and wrote in her function report that she never lifts 10 pounds. AR96-97, 267. Dr. Wingate opined she could lift 10 pounds occasionally and less than 10 pounds frequently. AR1377. The ALJ gave no weight to the state agency physicians' opinions. AR25. There is no medical opinion in the record showing Ms. Flatequal is capable of lifting 20 pounds up to 1/3 of an 8-hour workday (more than 2 ½ hours per day) as opined by the ALJ. The fact that Ms. Flatequal's second clavicle fracture had healed fully and that she had full range of motion in that joint does not require the conclusion she can lift 20 pounds regularly.

Dr. Wingate's opinion is supported not only by the claimant's testimony, but by other medical evidence in the record. She broke her clavicle once (AR420, 489) and had to have it surgically repaired (AR700, 704). Two years later she had the metal plate from the first surgery removed (AR1126), and her clavicle broke again within a matter of days (AR1117-18). She had to have a third surgery to address the second break (AR1362-63). Furthermore, other medical records indicate she has osteopenia--her bones had thinning beyond

---

[18] The ALJ *did* specify unlimited ability to handle, finger and feel with both hands in its oral hypothetical at the hearing. AR110. This is one of many discrepancies between the transcript of the hearing and the ALJ's written opinion, discussed in further detail at the step five portion of this opinion.

what is normal density for her age and gender (AR1128, 1183-85). Both experience (a bone breaking twice) and objective medical findings (thin bones) would support limiting Ms. Flatequal's lifting as Dr. Wingate opined. The ALJ never explained what evidence he relied upon to find she could lift more than she actually ever does in her ADLs or more than Dr. Wingate opined.

The second reason the ALJ cited for discounting Dr. Wingate's opinion was the doctor's own exam of Ms. Flatequal a few days before he issued his RFC opinion showed her upper and lower extremities were neurologically intact, she had 5/5 motor strength, and ambulated normally. AR26. But the ALJ never explained how these findings by Dr. Wingate support the elevated functions found by the ALJ. How does normal strength and neurological readings indicate one can lift 20 pounds for 2.5 hours a day or stand for 6 hours a day?

Dr. Wingate's opinion that Ms. Flatequal must alternate sitting and standing every 30 minutes is based on the longitudinal record of the persistent severe pain she has in her left leg/buttock which has lasted for a long period of time and was not relieved by steroid injections or physical therapy and by the documented objective deterioration in her spine. Dr. Wingate's March 1, 2018, exam findings do not negate these demonstrated impairments. A key portion of Dr. Wingate's March 1, 2018, exam not discussed by the ALJ details issues with her spine, hip and leg:

> She did have a L5-S1 transforaminal epidural steroid injection . . .
> She reports that she had 100% relief for up to a week and then it
> has waned since then. She has pain in the L5 distribution.
> Numbness and tingling goes all the way down to her foot. She had

> an MRI from September that did show she had some mild to moderate foraminal stenosis on the left at L5-S-1. . . . She does have lumbar spondylosis. No instability is noted. She does have L5-S1 disc breakdown, degeneration of facet arthrosis, and facet hypertrophy. This causes foraminal stenosis on the left at L5-S1.

AR1376.

At this appointment, Dr. Wingate ordered another MRI of her lumbar spine. Id. This MRI demonstrated lumbar degenerative disc disease most severe at L5-S1 without significant central spinal canal stenosis. AR1381. Also documented by the MRI was moderate neural foraminal stenosis on the left at L5-S1 with mild compression of the intraforaminal left L5 nerve root. Id. The MRI report and Dr. Wingate's physical RFC report bear the same date— March 7, 2018—so the court infers Dr. Wingate had the benefit of this report when he formulated his RFC opinion. Compare AR1381 with AR1379.

The final reason cited by the ALJ for discounting Dr. Wingate's opinion was his narrative comment that "no formal restrictions have been assigned." AR26, 1379. But the ALJ failed to note the remainder of Dr. Wingate's narrative comment: "Recommendations made based on diagnosis & current physical state. Clavicle fracture has healed." AR26, 1379. It is not known what "no formal restrictions" means in this context. Ms. Flatequal was not working and had not been working for some time, so there was no need for Dr. Wingate to issue work restrictions. He makes clear that his opinions are based on objective medical evidence: her diagnoses and her current physical state as revealed by Dr. Wingate's examination of her. The phrase "no formal

restrictions" is simply too frail a reed, too ambiguous to justify the ALJ's discounting of Dr. Wingate's opinion.

This issue is further muddled by facts not discussed by either party. The ALJ posed a hypothetical to the VE that included all of Dr. Wingate's physical RFC limitations except the need to alternate between sitting and standing every 30 minutes. AR110. The VE testified there were three sedentary jobs Ms. Flatequal could perform. AR111. When the VE was asked if one changed the hypothetical to include the alternate sitting and standing, the VE testified this would eliminate the possibility of full-time employment. AR112. Thus, the alternate sitting and standing opinion is crucial. Dr. Wingate's opinion as to the need to alternate between sitting and standing is supported by the longitudinal record as well as Ms. Flatequal's ADLs and her written and oral evidence. The ALJ did not explain adequately why it rejected this opinion.

The ALJ did not properly explain the basis for his physical RFC nor the reasons why Dr. Wingate's expert opinion was not worthy of full credence. If the ALJ wishes to have more insight into what "no formal restrictions" really means, he can inquire of Dr. Wingate upon remand or obtain his own consultative exam. The current state of the record does not supply substantial evidence for the ALJ to discount Dr. Wingate's opinion or to support the ALJ's physical RFC conclusions.

**F.   Step Five**

**1.   Jobs in the "National Economy"**

Ms. Flatequal argues the ALJ erred at step five because the VE never established that there were substantial numbers of the three jobs he identified existing in Ms. Flatequal's region or in several regions of the country.  At step five, the ALJ found there were other jobs Ms. Flatequal could perform within the RFC as formulated by the ALJ.  AR28.  The ALJ's conclusion was based on testimony from the VE that there were 48,000 copy machine operator, 55,000 mail clerk, and 68,000 clerical checker jobs available "nationally."  AR28, 108. By testifying to the number of jobs available in the entire United States, Ms. Flatequal alleges the VE and the ALJ used the wrong standard.  Her argument is based on statutory language.

Section 423(d) of Title 42 provides in pertinent part as follows:

(d)   "Disability" defined

    (1)   The term "disability" means—

        (A)   Inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months;

    * * *

    (2)   For purposes of paragraph (1)(A)—

        (A)   An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. ***For purposes of the preceding sentence*** (with respect to any individual), ***"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.***

See 42 U.S.C. § 423(d)(1)(A) and (2)(A) (emphasis added).

What is clear from the above emphasized language is that "work which exists in the national economy" is a term of art in Social Security law. It does not mean work in the entire United States. Instead, it means "work which exists in significant numbers either in the *region* where such individual lives or in *several regions* of the country." Id. (emphasis added). Now, what does that definition mean exactly?

The Commissioner cites Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997), and Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997), in support of affirming the ALJ's decision. These cases do not contravene the clear meaning of the statute cited above. The court in Long noted there were 650 surveillance monitoring, addressing, and document preparation jobs in Iowa, the claimant's region. Long, 108 F.3d at 188. Thus, the court's affirmance of the ALJ was based on evidence of jobs available in the claimant's "region," in conformity with the statute. Id. Likewise, in Johnson, the court affirmed the ALJ based on evidence introduced before the agency that 200 addresser and document preparer jobs existed in Iowa. Johnson, 108 F.3d at 180. Neither of these opinions stand for the proposition that there need not be evidence of the

number of jobs available in the claimant's region or in the several regions of the country.

To adopt the Commissioner's position—a position repeatedly asserted before this court in a number of Social Security appeals—would be to disregard a portion of the statutory language. The statute states clearly **" 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."** 42 U.S.C. § 423(d)(2)(A).

The Commissioner would have this court ignore this plain statutory mandate. This, the court cannot do for the Supreme Court teaches that every provision of a statute must be given effect when construing it: where a statute can be interpreted so as to give effect to all portions of the statute, that interpretation must prevail over an interpretation that nullifies some portion of the statute. Morton v. Mancari, 417 U.S. 535, 551 (1974). "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 665 (2007) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)).

Congressional intent is clear: the Commissioner *does* have to show that jobs exist in Ms. Flatequal's "region" or in "several regions of the country." 42 U.S.C. § 423(d)(2)(A). We know from the statutory language that "region" does *not* mean "immediate area." Id. The Commissioner's regulation likewise does

not define "region," but only says that "region" is not equal to "immediate area." 20 C.F.R. § 404.1566(a)(1).

In <u>Barrett v. Barnhart</u>, 368 F.3d 691, 692 (7th Cir. 2004), the court held the "other regions" language that Congress used in § 423(d)(2)(A) was intended to prevent the Social Security Administration from denying benefits on the basis of isolated jobs existing only in very limited numbers in relatively few locations outside the claimant's region. This sentiment is paralleled in the Commissioner's regulation where it states: "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered 'work which exists in the national economy.' We will not deny you disability benefits on the basis of the existence of these kinds of jobs." 20 C.F.R. § 404.1566(b).

The dictionary defines "region" as "a large, indefinite part of the earth's surface, any division or part." <u>Webster's New World Dictionary</u>, at 503 (1984). "A subdivision of the earth or universe." OED (3d ed. Dec. 2009). We know from Congress' statute and from the Commissioner's regulation, that "region" does not mean the entire country, nor does it mean the claimant's immediate area. <u>See</u> 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 1566(b). The dictionary defines "region" as an indefinite parcel that is part of the whole, and so must be something less than the whole.

The court concludes, as it must, that "national economy" does not mean "nationally." Instead, at Step 5, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own "region" (something less

than the whole nation), or in "several regions" (several parts that, together, consist of something less than the whole nation).  Id.  The VE did not testify to numbers of jobs existing in Ms. Flatequal's region or in "several regions," only that a certain number of jobs existed "nationally."  AR108.  This testimony fails to provide support for the ALJ's step five determination.  The burden is on the Commissioner at step five.  Here, he failed to carry that burden.  The court will remand for a reconsideration and redetermination of the ALJ's step five analysis.

### 2.     Conflicts Between Hypothetical and DOT Descriptions

Ms. Flatequal also argues there was a conflict between the ALJ's hypothetical and the DOT descriptions of the jobs identified by the vocational expert ("VE").  Specifically, the ALJ's hypothetical included a restriction to following only "short, simple instructions."  AR21.  Under the DOT, Ms. Flatequal asserts this equates to a reasoning level 1.  Hulsey v. Astrue, 622 F.3d 917, 923 (8th Cir. 2010).  Two of the jobs identified by the VE require reasoning level 2 while the third job identified by the VE requires reasoning level 3.  There was no testimony from the VE or analysis by the ALJ resolving this discrepancy.[19]  Thus, Ms. Flatequal argues, the ALJ's conclusion that Ms. Flatequal could perform these three jobs is not supported by substantial evidence.

_____

[19] The ALJ asked the VE whether his opinion was consistent with the DOT descriptions and the VE testified it was.  AR108-09.

The Commissioner argues the ALJ's mental RFC limiting Ms. Flatequal to understanding, remembering and carrying out "short, simple instructions" is consistent with level 2 reasoning. The Commissioner cites Moore v. Astrue, 623 F.3d 599, 604 (8th Cir. 2010), for the proposition that a mental RFC limiting a claimant to "simple job instructions" and "simple, routine and repetitive work" is congruent with level 2 reasoning. The Commissioner also argues the jobs identified by the VE are classified as "unskilled," the least complex kind of work, defined by regulation as "need[ing] little or no judgment to do simple duties that can be learned on the job in a short period of time." See Docket No. 15 at p. 13 (citing 20 C.F.R. § 404.1568(a)). Unskilled work can be level one or level two in the DOT. Hulsey, 622 F.3d at 923.

The Eighth Circuit discussed the difference between level 1 and level 2 reasoning again more recently in Stanton v. Commissioner, Social Security Administration, 899 F.3d 555 (8th Cir. 2018). In Stanton, the court discussed in more detail the minutiae of the difference between level 1 and level 2 reasoning as defined by the DOT. Id. at 558-60. The court ultimately determined there was an unresolved conflict in the VE's testimony between the job identified by the VE and the DOT, because the job identified as being one the claimant was capable of performing required level 2 reasoning, while the RFC described by the ALJ indicated the claimant was capable of only level 1 reasoning skills. Id. at 558.

In Stanton, the court also made the following fine distinction between the definitions of level 1 and level 2 reasoning: during the hearing when reciting

the hypothetical to the VE and in its written decision, the ALJ formulated the claimant's RFC as having the ability to "understand, retain and carry out one-to two-step instructions." Id. at 558. The court explained "these statements correspond directly to language used by the Dictionary to describe Level 1 Reasoning." Id.

The court contrasted the ALJ's hypothetical and ultimate RFC formulation to different language which merely limits the claimant to "carrying out simple job instructions" and "simple, routine and repetitive work activity." Id. at 559. A person with such a described RFC, the court held, "may be able to perform work requiring Level 2 Reasoning." Id. (citing Moore, 623 F.3d at 604). The difference between Stanton and Moore the court emphasized, is that the ALJ in Moore did not limit job instructions to simple *one or two-step* instructions or otherwise indicate the claimant could only perform occupations at DOT reasoning level 1. Id. In Stanton the ALJ did so limit the claimant. Id. Therefore, the language used by the ALJ in Moore was properly construed as compatible with reasoning level 2, whereas the slightly different language used by the ALJ was not properly construed as compatible with reasoning level 1 in Stanton.

The court now returns to the language in the RFC as it was articulated in the hypothetical to the VE and in the ALJ's written decision in this case. In both instances, the ALJ used the phrase "short simple instructions" and "simple work-related decisions." AR21, AR108. According to Moore and Stanton, this phraseology is not inconsistent with a job whose description

contains a reasoning level 2 requirement.  <u>Moore</u>, 623 F.3d at 604, <u>Stanton</u>, 899 F.3d at 558.  The court will therefore not remand based on this assignment of error.

In addition, the court notes the <u>Hulsey</u> decision, on which Ms. Flatequal relies, is distinguishable because Hulsey had borderline intellectual functioning.  <u>Hulsey</u>, 622 F.3d at 922.  Ms. Flatequal, by contrast, has normal attention, concentration, language, visual/perception, memory/learning, and judgment (AR892), and her supervisor at Goodwill wrote in her performance evaluation that Ms. Flatequal "could easily follow simple instructions."  AR353. On these facts, <u>Hulsey</u> does not stand for the proposition that Ms. Flatequal should be limited to jobs solely with a DOT reasoning level one.

There are actually other discrepancies in the record concerning the VE's testimony and the ALJ's decision.  For example, the ALJ states in its opinion that the VE testified Ms. Flatequal *could* return to her past employment, but the ALJ rejected this testimony.  AR27.  That actually never occurred.  The VE repeatedly answered in response to all of the ALJ's hypotheticals that Ms. Flatequal *could not* return to her past work.  AR108-11.  Because the ALJ ultimately concluded Ms. Flatequal *could not* return to her past relevant work, this can be characterized as harmless error.  But it serves to illustrate how disordered the ALJ opinion is with regard to the VE testimony.

In addition, at the ALJ hearing, the ALJ included "no limitations with respect to handling, fingering, or feeling with either hand" in its hypothetical to

the VE.  AR110.  However, that description was not included in the ALJ's description of its RFC in its opinion.  AR21.

Although the court is not remanding based on the alleged discrepancy between the RFC and the DOT job descriptions, the court is remanding for other reasons.  On remand, the ALJ should clarify what elements from its oral hypothetical are included in the final mental and physical RFC rendered in its written opinion and the ALJ should clarify whether its RFC includes the mental ability to perform at the DOT level two or only level one.

## G.    Type of Remand

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Flatequal requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision

and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

Ms. Flatequal's motion to remand [Docket No. 13] is GRANTED and the Commissioner's motion to affirm [Docket No. 17] is DENIED.

DATED October 2, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge